STATE OF NORTH CAROLINA v. KARL NOEL GREENE

No. 218A91

(Filed 19 November 1992)

1. **Constitutional Law § 309 (NCI4th)— murder—closing argument—defense counsel—guilty of involuntary manslaughter if guilty at all—not ineffective assistance of counsel**

   A murder defendant was not deprived of effective assistance of counsel where the Supreme Court believed that defense counsel's closing argument had been that defendant was innocent of all charges but, if he were to be found guilty of any of the charges, it would be involuntary manslaughter because the evidence came closer to proving that crime than any of the other crimes charged.

   **Am Jur 2d, Criminal Law §§ 748, 749, 751, 752.**

   **Adequacy of defense counsel's representation of criminal client regarding argument. 6 ALR4th 16.**

2. **Constitutional Law § 309 (NCI4th)— murder of child—closing argument—defense argument not an admission of guilt**

   Defense counsel in a murder prosecution did not, as defendant contended, tell the jury that he believed defendant was guilty of involuntary manslaughter but that defendant wanted him to argue that he should go free. The clear and unequivocal argument was that defendant had slapped the victim but was innocent of all charges.

   **Am Jur 2d, Criminal Law §§ 748, 749, 751, 752.**

   **Adequacy of defense counsel's representation of criminal client regarding argument. 6 ALR4th 16.**

3. **Homicide § 253 (NCI4th)— murder of child—hard blows to the head—evidence of premeditation and deliberation**

   The trial court did not err by submitting to the jury the charge of first degree murder on the theory of premeditation and deliberation were there was evidence that the victim, a five-year-old child, was brutally beaten during which time the defendant delivered several hard blows to the victim's

head. A reasonable man would know that this would very likely cause the death of the child.

**Am Jur 2d, Homicide §§ 52, 439.**

4. **Evidence and Witnesses § 3172 (NCI4th)— murder—statements of defendant to inmate—corroboration by officer—new material—not prejudicial**

There was no prejudice in a prosecution for the murder of a child in the admission of testimony from an SBI agent corroborating the testimony of an inmate to whom defendant had made incriminating remarks. Assuming *arguendo* that the agent's testimony concerned matters about which the inmate did not testify and which did not corroborate the inmate's testimony, there was no reasonable possibility of a different result had the error not occurred because there was properly admitted testimony of the same kind of feelings by defendant.

**Am Jur 2d, Appeal and Error §§ 778, 798, 800.**

5. **Evidence and Witnesses § 1240 (NCI4th)— murder—exculpatory statement—taken while in custody—no Miranda warnings— not prejudicial**

There was no prejudicial error in a prosecution for the murder of a child in the admission of defendant's first statement to officers where defendant was taken from the hospital to the sheriff's office; defendant was not told that he was under any restraint, but a detective was told to go into the room with defendant and not to allow him to leave; the detective handcuffed defendant and told him not to leave; the handcuffs were removed approximately ten minutes later; the detective removed defendant's socks so that they could be examined for evidence; defendant was examined by SBI agents after he had been at the sheriff's office for about forty-five minutes; and the agents did not advise defendant of his *Miranda* rights. However, this first statement was exculpatory, a second statement was virtually the same and was properly admitted, and two inculpatory statements by defendant were properly admitted. The erroneous admission of the first statement was harmless beyond a reasonable doubt.

**Am Jur 2d, Appeal and Error §§ 778, 798, 800.**

STATE v. GREENE

[332 N.C. 565 (1992)]

6. **Evidence and Witnesses § 1240 (NCI4th) — murder — statements at sheriff's office — not custodial — properly admitted**

A defendant in a murder prosecution was not in custody when he made his second and third statements where, immediately after his first statement, two SBI agents told defendant that he was not under arrest and was free to leave; they also told defendant that they wanted to go to his home and he consented to their searching his home; defendant accompanied the officers to his home; the officers stopped at a convenience store on the way and bought defendant a drink; they left defendant outside the store and unattended for about five minutes while they were inside; they also stopped and tried to start defendant's truck so that he could drive it home; defendant went into the house alone to change clothes; the officers asked defendant to return to the sheriff's office to clarify his previous statement after they had finished searching; they told defendant at that time that he was not in custody and did not have to return to the sheriff's office; and the officers again told defendant that he was not under arrest and was free to leave before they resumed the interrogation.

**Am Jur 2d, Criminal Law §§ 793, 794.**

**What constitutes "custodial interrogation" within rule of Miranda v. Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.**

7. **Evidence and Witnesses § 1227 (NCI4th) — murder — statements by defendant — prior statement inadmissible — second and third statements admissible**

Although a murder defendant's first statement should have been suppressed under the presumption of involuntariness rule of *Miranda*, his second and third statements were properly admitted because there was no evidence that the first statement had been induced by promises or threats. The rule that a presumption arises from an involuntary confession which imputes the same prior influence to any subsequent confession predates *Miranda* and the reason for the rule does not exist where no threats or promises were used to extract the first confession.

**Am Jur 2d, Evidence § 537.**

8. **Evidence and Witnesses § 1218 (NCI4th)— murder—statement to officers—not the result of psychological coercion**

A murder defendant's third statement to officers was not coerced and was voluntary where a reasonable person in defendant's position would not have believed that he was in custody, so that his contention that his will was overcome by prolonged questioning, the continuous presence of law enforcement officers, or his isolation from the outside world was not persuasive since defendant could have terminated these allegedly coercive influences by exercising his freedom to leave; it could not be held under the circumstances that defendant was held incommunicado or that he was deprived of food and drink; defendant was not deprived of his free will when he was confronted by the officers with apparent inconsistencies in his statements; and, although officers told defendant that they were his only friends and that they would help him with any problems he had, they did not intimate that by confessing that he could avoid prosecution or that any sentence imposed would be lessened.

**Am Jur 2d, Evidence §§ 529, 550, 565.**

9. **Evidence and Witnesses § 1218 (NCI4th)— murder— incriminating statement—totality of circumstances—voluntary**

A murder defendant's fourth statement was not involuntary based on the totality of the circumstances where defendant contended that the statement was involuntary because he was in custody; he had been jailed overnight; he had spent the night reviewing his third statement; he had had suicidal thoughts; his only contact with other persons for the previous nineteen hours had been with police officers; and he had just encountered members of the media. The trial court's findings that defendant was advised of his rights pursuant to the *Miranda* decision, that he understood each right and waived the same, and that he was alert, sober and coherent were supported by competent evidence.

**Am Jur 2d, Evidence §§ 545, 613.**

10. **Evidence and Witnesses § 1240 (NCI4th)— murder—incriminating statement—not the result of an unlawful seizure**

A murder defendant's statements to officers were not the result of an unlawful seizure where defendant was not

in custody when two of the statements were made and the third statement was made after defendant was lawfully arrested.

**Am Jur 2d, Evidence §§ 545, 546, 613.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Wilson, J., at the 26 November 1990 Criminal Session of Superior Court, Lincoln County, upon a verdict of guilty of first degree murder. Heard in the Supreme Court 16 April 1992.

The defendant was tried for first degree murder in a case in which the State did not seek the death penalty. The State's evidence tended to show that the defendant had been living with his girlfriend, Tina Duncan, for approximately one and one-half years. Duncan's two children Shawn Wayne Duncan, the victim, and Amber Michelle Duncan also lived with the couple.

On 29 August 1989, the victim's mother and his sister left the house at 6:30 a.m. The defendant and the victim were still asleep. At approximately 2:00 p.m., the defendant left his home in his truck to take the unconscious victim to the hospital. The defendant's truck broke down before reaching the highway. The defendant then stood on the highway and flagged down an approaching vehicle. When the vehicle stopped, the defendant took the victim from the defendant's truck and carried him to the car. The defendant asked the vehicle's occupants to drive to the hospital. He then attempted to resuscitate the child. The driver of the automobile stopped in order to call an ambulance, and the defendant left the car, went back to the highway and flagged down another vehicle which took the defendant and the victim to the hospital.

At the hospital the defendant was met by officers from the Sheriff's Department who had been dispatched to investigate the child's death. The officers learned that the child had apparently been beaten to death and that he had been brought to the hospital by the defendant. The officers briefly spoke with the defendant and asked him if he would accompany them to the Sheriff's office in order to give a statement. The defendant agreed to do so. During the following hours, the defendant made three statements to the investigating officers. After making the third statement the defendant was arrested. The following morning the defendant gave a fourth statement. Additional facts regarding the circumstances surrounding these statements will be set forth later in this opinion.

**STATE v. GREENE**

[332 N.C. 565 (1992)]

The medical evidence tended to show that the victim's death was caused by the swelling of his brain and that the brain swelling was caused either by his being beaten about the head, his being severely shaken, or his head being beaten against a stationary object.

At trial, the defendant testified that he had slapped the child's face, but that he had not intended to harm him. He further testified that he had thereafter slept for approximately one and one-half hours and that when he awoke he found the victim unconscious on the kitchen floor.

The defendant was convicted as charged and was sentenced to life in prison.

*Lacy H. Thornburg, Attorney General, by Jane R. Garvey, Assistant Attorney General, for the State.*

*Heidi G. Chapman, for the defendant appellant.*

WEBB, Justice.

[1] The defendant's first assignment of error deals with his trial counsel's final argument to the jury. The defendant contends that his trial counsel, without the defendant's consent or authorization, argued that the jury should find the defendant guilty of involuntary manslaughter, thus depriving the defendant of his constitutional right to the effective assistance of counsel. Trial counsel argued, in part, as follows:

Karl Greene didn't have anything to do with me being here. Don't use what I've said and done against him. Wouldn't be right. I've done my best. I've plowed the field. And in my opinion, you probably won't turn him free—find him not guilty. And you very easily, I can see, that that slap was negligent and harder than it ought to have been and at that time, it was reckless disregard, and the judge will charge you on that at the end of those four—involuntary manslaughter. I don't say you should find that, but I concede—sitting on this jury—but I contend, ladies and gentlemen, there's no premeditation and deliberation.

At the close of trial counsel's argument, the district attorney approached the bench and expressed his concern that defense counsel's argument may have been improper. Although the trial judge expressed a similar concern, he stated that it was his recollec-

tion that "[defense counsel] argued that they might find the lesser offense of involuntary manslaughter or voluntary manslaughter, but that he didn't think they would find that." The judge then asked the defendant if he would like for defense counsel to be given "the opportunity to argue further on—that you're innocent of all charges." The defendant said that he would like for the court to allow his counsel to so argue. The defendant contends that his counsel's additional argument was similarly improper. Counsel argued as follows:

> Now, again, coming to the close, the defendant contends there is no evidence to find him guilty of first degree murder— that is, got to find all six or five—no premeditation, nobody— nothing showing he even, for a blink of a minute, thought about killing somebody. No deliberation going through his mind. Now is the time to kill him. No malice. No hatred. No deliberately, like a baseball bat as they illustrated in other things. No malice. In fact, all love before and after. All love.

> As to voluntary manslaughter, no intent down there. No intent to murder. No reckless disregard of life. Again, all love except the blows and the reflex motion, and it was too hard.

> But we don't contend—he didn't know it was going to be too hard. I argue and contend that he didn't know it was going to be too hard. He didn't know what he was doing.

> Most of us, up before this, didn't know that a slap on the face could kill anybody. I mean, even a young child. Busted his lip, he may.

> Now, it's been some people with nursing training and all, I'm sure. Those are not supposed to be a lot of training, but even involuntary manslaughter.

> We contend that Karl ought to leave here a free man. . . .

The defendant contends that his attorney argued to the jury, without the defendant's consent, that the jury should find him guilty of involuntary manslaughter and this was ineffective assistance of counsel, requiring a new trial pursuant to *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986). We cannot hold that the defendant's attorney so argued. In his first argument the attorney said that in his opinion the jury would not find the defendant not guilty

and that it could easily find that the "slap was negligent," "harder than it ought to have been," and "it was reckless disregard." Nevertheless, he further argued that, "I don't say you should find that." We believe the argument was that the defendant was innocent of all charges but if he were to be found guilty of any of the charges it should be involuntary manslaughter because the evidence came closer to proving that crime than any of the other crimes charged. This is not the equivalent of asking the jury to find the defendant guilty of involuntary manslaughter and the rule of *Harbison* does not apply.

[2]    As to the second argument, the defendant contends that his counsel in one breath argued that the defendant was guilty of involuntary manslaughter and in the next breath asked the jury to find the defendant not guilty. The defendant also says that in his second argument the defendant's counsel appeared to be telling the jury that he believed that the defendant was guilty of involuntary manslaughter, but the defendant wanted him to argue that he should go free.

We disagree with the defendant's characterizations of the second argument. We do not find anything in it that approaches an admission of guilt. The clear and unequivocal argument was that the defendant was innocent of all charges. Although the defendant's counsel admitted, as did the defendant in his testimony, that the defendant slapped the victim, he argued that this was not a sufficient basis upon which to find the defendant guilty of any charge.

This assignment of error is overruled.

[3]    The defendant next contends it was error to submit to the jury the charge of first degree murder on the theory of premeditation and deliberation. He says there is no evidence that he planned to kill the child. Premeditation and deliberation are often not provable by direct evidence and must be proved by circumstantial evidence. *State v. Buchanan*, 287 N.C. 408, 215 S.E.2d 80 (1975). In this case, there was evidence that the victim, a five year old child, was brutally beaten during which time the defendant delivered several hard blows to the victim's head. A reasonable man would know that this would very likely cause the death of the child.

In the light most favorable to the State, the jury could have found that, knowing what these hard blows to the head would likely do to the child, the defendant intended the natural result

of his action. They could have found that the defendant intended to kill the child. When they found the defendant intended to kill the child they could have found he formed this intent some period of time, however short, before delivering the lethal blows. The jury could have found there was not a sufficient legal provocation to cause the defendant to be under the influence of a violent passion which would keep him from being in a cool state of blood. This would satisfy the State's burden to prove that the defendant killed the child intentionally with premeditation and deliberation. *State v. Perdue*, 320 N.C. 51, 357 S.E.2d 345 (1987). This assignment of error is overruled.

[4] The defendant's third assignment of error deals with testimony elicited to corroborate the testimony of a witness for the State. Kenneth Wayne Gardner testified for the State that he was an inmate in the Taylorsville Correctional Facility. He testified further that he was at one time in the Dorothea Dix Hospital with the defendant and discussed the defendant's case with him.

Gardner testified that the defendant told him that he "smacked the kid" and the child hit a table "across the forehead." He then "hit the kid a couple of times in the face." Gardner testified further that the defendant told him that he hated the child and the child's father and that he would have killed the child's sister if she had been there.

The State called William C. Lane, an agent of the State Bureau of Investigation, who testified to corroborate the testimony of Gardner. Mr. Lane testified that Gardner told him the defendant told Gardner that he "just hauled off and slapped the boy." The child fell into a table and he hit the child a few more times. Mr. Lane testified further that Gardner said the defendant told him he hated the child and he hated the child's father and would have killed the little girl if she had been there. Mr. Lane also testified that Gardner told him that the defendant said he wanted to kill the child's father and that if he was released from incarceration he would kill the little girl.

The defendant contends that it was error to admit the testimony of Mr. Lane that Gardner told him the defendant said he wanted to kill the father and that he would kill the little girl if he was released from prison because it did not corroborate any of Gardner's testimony. Gardner testified that the defendant said he hated the child's father, but did not say he wanted to kill the father. Gardner

also testified that the defendant said he would have killed the little girl if she had been at the scene when he killed the little boy, but Gardner did not testify the defendant said he would kill her if he were released from prison.

The defendant contends this testimony by Mr. Lane concerned matters to which Gardner did not testify and did not corroborate Gardner's testimony. We have held that corroborative testimony may contain new or additional information when it tends to strengthen and add credibility to the testimony it corroborates. *State v. Burton*, 322 N.C. 447, 368 S.E.2d 630 (1988); *State v. Kennedy*, 320 N.C. 20, 357 S.E.2d 359 (1987); *State v. Ramey*, 318 N.C. 457, 349 S.E.2d 566 (1986). Assuming arguendo that this testimony did not corroborate any testimony by Gardner and should have been excluded, its admission was not prejudicial error.

In light of the testimony properly admitted that the defendant said he would have killed the victim's sister if she had been present and he hated the child's father, there was evidence of the defendant's hatred of the members of the child's family to the extent he would kill them. If the jury believed this testimony, we cannot hold that additional testimony of the same kind of feelings by the defendant shows there is a reasonable possibility that had this error not occurred a different result would have been reached at the trial. We hold that any error was harmless. N.C.G.S. § 15A-1443 (1988); *State v. Milby*, 302 N.C. 137, 273 S.E.2d 716 (1981).

[5] The defendant next assigns error to the admission into evidence of four statements he made to law enforcement officers. The defendant made a motion to suppress the statements and a *voir dire* hearing out of the presence of the jury was held prior to the trial to determine the questions raised by the defendant's motion. He contended the statements were made while he was in custody without warning him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966), and that the statements were not voluntary.

The State's evidence at the *voir dire* hearing showed that Ronnie Matthews, a detective with the Lincoln County Sheriff's Department, and a Mr. Keener, a deputy sheriff, were at the hospital at approximately 2:45 p.m., as was the defendant. Mr. Matthews was informed by a doctor that the child had been beaten to death and he asked the defendant to go with him to the sheriff's office and give him a statement as to what had happened. The defendant

agreed to do this and he rode in Mr. Keener's automobile to the sheriff's office.

The defendant arrived at the sheriff's office at approximately 3:00 p.m. He was not told he was under any restraint at that time. Andy Hoyle, a detective in the Sheriff's Department, was told by one of his superiors to go into the room with the defendant and not to allow the defendant to leave. Mr. Hoyle entered the room with the defendant and handcuffed him. Mr. Hoyle told the defendant he could not leave the room. This occurred between 3:30 and 4:00 p.m. The handcuffs were removed approximately ten minutes after they were placed on the defendant. Mr. Hoyle removed the defendant's socks in order for them to be examined for the presence of evidence.

After the defendant had been at the sheriff's office for approximately forty-five minutes he was questioned by William C. Lane and Steven C. Cabe, who were special agents with the State Bureau of Investigation. They were not aware that the defendant had been handcuffed. They did not advise the defendant of his rights under *Miranda* but asked him what had happened to the dead child. The defendant told them that he had been at home with the child that morning at which time the child was outside the house playing on a trampoline. A short while later he saw the child lying on the ground. He went to the child and found him unconscious.

After taking this statement, the two SBI agents learned that the defendant had been handcuffed. They immediately informed the defendant that he was not under arrest and that he was free to leave. After so informing the defendant, the agents told him that they wanted to go to the defendant's home in order to further investigate the victim's death. The defendant executed a document by which he consented to the agent's search of the home. The defendant also agreed to accompany them to his home. Between 5:00 and 5:30 p.m. the defendant, Detective Matthews and the two SBI agents left the station to go to the defendant's home.

En route to the defendant's home, the men stopped at a convenience store where one of the agents bought the defendant a drink. The defendant was allowed to exit the store and wait for the other men to return to the car. The defendant could not be seen by the officers and was left unattended for as long as five minutes until he was rejoined by the officers. Continuing towards the defendant's home, the men stopped and tried unsuccessfully to start

the defendant's truck so that he would have his own transportation. The defendant executed a document by which he consented to the officers searching his truck. They then proceeded to the house.

Upon arrival at the defendant's home, the defendant entered the house alone in order to obtain some clothes. The defendant was alone in the house for five minutes before being joined by the officers. The officers then searched the house and the areas outside of the house. They asked the defendant to show them where he had been during the occurrence of the events that he had described in his earlier statement. The defendant agreed to do so. Shortly thereafter, the officers asked the defendant if he would go back to the station and again talk to the officers so that they could try to get a better understanding of what had occurred that morning. They told him he was not under arrest and he did not have to accompany them. The defendant agreed to return to the station and to ride there with the officers.

After arriving at the Sheriff's Department at approximately 6:45 p.m., the defendant was again informed that he was not under arrest and that he was free to leave. He was left unattended for approximately ten minutes prior to giving his second statement which began at 6:55 p.m. The defendant was not given the warnings prescribed by *Miranda* prior to his giving the statement nor had he been so advised at any earlier time.

The defendant then gave another statement similar to his first account of what had occurred that morning. He then left the room to go to the restroom. When the defendant returned to the room, the officers explained to him that there were some discrepancies in what the defendant had just told the officers and what they had observed at the defendant's house. The officers continued to talk to the defendant for 30 to 45 minutes about the defendant, his friends and his background. The defendant then interjected that, "[i]t is something I can't control. It is there, and then it's gone. It is anger, and I don't know why or where it comes from." The officers then asked the defendant to tell them the truth about what happened.

The defendant then gave another statement to the officers. In this third statement, he described how he had gotten out of bed shortly after noon. The defendant stated that as soon as he got up, "[i]t hit him." He told the victim to get dressed and to go outside and play. When the child put on dirty clothes, the defend-

STATE v. GREENE

[332 N.C. 565 (1992)]

ant became very angry and began to yell at the child. The defendant was angered by everything that the child did or the manner in which it was done. He began to strike the child repeatedly. He was unable to control himself and could not stop until the child lost consciousness. At that point the defendant attempted to resuscitate the child. He then took the child to his truck and tried to drive to the hospital but the truck broke down. The defendant then flagged down the first of the two vehicles which carried him and the victim to the hospital.

After giving this statement, the defendant was arrested and placed in the Lincoln County jail. The following morning, the defendant was advised of his *Miranda* rights. This was the first occasion that the defendant had been so advised. After waiving those rights, the defendant gave his fourth statement to the investigating officers. In this statement, he again admitted that he had beaten the child until the child lost consciousness.

The court made findings of fact consistent with this testimony and concluded that the first three statements were given during non-custodial interrogations and were freely and voluntarily made. It held that "even if it should be determined" that the first three statements were involuntary, the fourth statement was "made after the defendant had occasion to reflect upon it and that it was made after his rights had been fully advised him, and the same was freely, voluntarily and understandably made without coercion, without threat or the perception of threat." The court ordered that all four statements be admitted into evidence.

The defendant assigns error to the admission into evidence of the four statements. As to the first statement made by the defendant, we hold that the defendant's assignment of error has merit. The determination of whether an interrogation is conducted while a person is in custody involves reaching a conclusion of law. While this conclusion may rest upon factual findings, it is a legal conclusion, fully reviewable, and not a finding of fact. *State v. Davis*, 305 N.C. 400, 290 S.E.2d 574 (1982). The test for determining whether a person is in custody is an objective test as to whether a reasonable person in the position of the defendant would believe himself to be in custody or that he had been deprived of his freedom of action in some significant way. *Oregon v. Mathiason*, 429 U.S. 492, 50 L. Ed. 2d 714 (1977); *State v. Braswell*, 312 N.C. 553, 324 S.E.2d 241 (1985). The defendant had been handcuffed and told

he could not leave the room within an hour of the time he made his first statement. The two SBI agents did not tell him he was not in custody at that time. We hold that a reasonable person in the defendant's position would have believed he was in custody. It was error to admit into evidence the defendant's first statement which was taken while the defendant was in custody without the warnings required by *Miranda*. However, we hold, for reasons which will be shown in this opinion, that this error was harmless beyond a reasonable doubt.

[6] We hold that the defendant was not in custody when he made his second and third statements. Immediately after the defendant made his first statement, the two SBI agents learned the defendant had been handcuffed. They told him at that time that he was not under arrest and was free to leave. They then told the defendant they wanted to go to his home and he consented to their searching his home. The defendant accompanied the officers to his home. On the way to the defendant's home they stopped at a convenience store and the officers bought a drink for the defendant. The officers left the defendant outside the store and unattended for approximately five minutes while they were inside. They also stopped and tried to start the defendant's truck so that he could drive it to his home. While they were at the defendant's home, the defendant went into the house alone to change clothes. After they had finished searching the defendant's home, the officers asked him to return to the sheriff's office in order to clarify his previous statement. At that time they told him he was not in custody and did not have to return to the sheriff's office with them. The defendant agreed to return to the sheriff's office. Before they resumed the interrogation, the officers again told the defendant he was not under arrest and was free to leave. In light of this testimony, we hold that a reasonable man would not have believed he was in custody when the second and third statements were given. *State v. Allen*, 322 N.C. 176, 367 S.E.2d 626 (1988).

[7] We must now determine what effect, if any, the defendant's first statement, which was taken in violation of *Miranda*, has on the admissibility of his subsequent, unwarned, non-custodial statements. It is well-settled in this jurisdiction that "where a confession has been obtained under circumstances rendering it involuntary, a presumption arises which imputes the same prior influence to any subsequent confession, and this presumption must be overcome before the subsequent confession can be received in

evidence." *State v. Siler*, 292 N.C. 543, 551, 234 S.E.2d 733, 739 (1977) (quoting *State v. Silver*, 286 N.C. at 718, 213 S.E.2d at 253 (1975)).

This rule predates the decision in *Miranda* and arose out of a concern that where the first confession was induced by promises or threats rendering it involuntary, those influences may continue to operate so as to deprive a suspect of his free will during subsequent interrogations. *Id.* The *Miranda* rule, which we have determined required suppression of the defendant's first statement, is based upon a presumption of involuntariness and no actual compulsion need be shown. *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222 (1985). In this case, the trial court found that at no time had the defendant been threatened or promised anything in order to obtain his statements. "[W]here no threats or promises were used to extract the first confession, as in this case, the reason for the rule giving rise to the presumption [that subsequent confessions are tainted by the same influences that rendered the earlier confessions involuntary] does not exist." *State v. Siler*, 292 N.C. at 552, 234 S.E.2d at 739. There being no evidence that the defendant's first statement was induced by promises or threats, the trial court properly admitted the defendant's subsequent statements, despite the inadmissibility of his first statement. *See State v. Barlow*, 330 N.C. 133, 409 S.E.2d 906 (1991); *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222.

[8] The defendant next contends that his third and fourth statements were involuntary. He argues that based on the totality of the circumstances, these statements were the product of psychological coercion. In the alternative, he contends that if his fourth statement was not itself involuntary, it was tainted by the involuntariness of his third statement and thus inadmissible.

Whether a confession was voluntarily given is to be determined from the totality of the circumstances surrounding the confession. *State v. Richardson*, 316 N.C. 594, 342 S.E.2d 823 (1986). Among the factors to be considered in determining the voluntariness of a confession are: the defendant's mental capacity; whether the defendant was in custody at the time the confession was made; and the presence of psychological coercion, physical torture, threats, or promises. *State v. Gray*, 268 N.C. 69, 150 S.E.2d 1 (1966). The presence or absence of one or more of these factors is not determinative. *Richardson*, 316 N.C. at 601, 342 S.E.2d at 829. Whether

a confession is voluntary is a question of law and is fully reviewable on appeal. *State v. Barlow*, 330 N.C. 133, 409 S.E.2d 906.

The defendant contends that there are several factors that when taken together show, that at the time he made his third statement, his ability to exercise his free will had been undermined. These factors are that he was: (1) in custody; (2) questioned for prolonged periods of time; (3) deprived of food and drink; (4) continuously in the uninterrupted presence of law enforcement officers; (5) isolated from the outside world; (6) confronted with inconsistencies in his previous statements; and (7) subjected to psychologically coercive interrogation techniques.

We consider the defendant's contentions in light of the foregoing principles. After the defendant and the SBI agents returned from the defendant's home to the sheriff's office, a second session of interrogation began shortly before 7:00 p.m. and ended between 10:30 p.m. and 11:00 p.m. It was during this time that the defendant made his third statement in which he confessed to killing the victim. We have already determined that at the time the defendant made his third statement a reasonable person in his position would not have believed he was in custody. Because the defendant was not in custody and was free to leave, we are not persuaded by his contention that his will was overcome by "prolonged questioning," the continuous presence of law enforcement officers, or his "isolation" from the outside world. By exercising his freedom to leave, the defendant could have terminated these allegedly coercive influences. Additionally, this Court has held that interrogations of longer duration than the one at hand are not so protracted as to render them coercive. *See State v. Morgan*, 299 N.C. 191, 261 S.E.2d 827, *cert. denied*, 446 U.S. 986, 64 L. Ed. 2d 844 (1980); *State v. Booker*, 306 N.C. 302, 293 S.E.2d 78 (1982).

There was no evidence that the defendant ever expressed a desire to talk with anyone other than the officers or that he would have been prevented from doing so. The defendant never indicated that he did not want to talk with the officers. Likewise, there was no evidence that the defendant ever requested food or drink or that officers would have refused to honor such a request. To the contrary, when the officers stopped at a store on their way to the defendant's house, they bought him a drink and offered to buy him cigarettes. Under the circumstances of this case, we

cannot hold that the defendant was held incommunicado or that he was deprived of food and drink.

Nor do we agree with the defendant that he was deprived of his free will when he was confronted by the officers with apparent inconsistencies in his statements. This Court has held that a confession is not rendered involuntary by the fact that it is made after a defendant is confronted with circumstances normally calling for an explanation, *State v. Mitchell*, 265 N.C. 584, 144 S.E.2d 646 (1965), *cert. denied*, 384 U.S. 1024, 16 L. Ed. 2d 1029 (1966), or by the fact that a defendant is confronted with evidence recovered from the crime scene. *State v. Booker*, 306 N.C. 302, 293 S.E.2d 78. Confronting the defendant with inconsistencies in his statements is no more coercive than confronting a murder suspect with a knife that was allegedly recovered from the crime scene and which allegedly bore the suspect's bloody fingerprint. *See State v. Jackson*, 308 N.C. 549, 304 S.E.2d 134 (1983).

Finally, the defendant contends that the following portion of his testimony, which was corroborated in part by a State's witness, shows that the interrogating officers utilized psychologically coercive techniques to obtain the defendant's confession. The defendant testified:

> [Matthews] was talking about he knows how much love you can have for a little one, and he knows how much I loved mine, and he was telling me how much he loved his daughter. . . . [T]he gentlemen were leaning over towards me, no further from the front of this bench right here, holding onto my legs and arms and telling me that they were my friends and telling me that I had no other friends and that if any problems I had, that they would help me with. At the time, Detective Matthews got the picture off his wall . . . of his daughter and held it up in front of me.

This Court has consistently held that "psychologically" coerced confessions are those that are induced by hope or fear. *State v. Hayes*, 314 N.C. 460, 334 S.E.2d 741 (1985); *State v. Schneider*, 306 N.C. 351, 293 S.E.2d 157 (1982); *State v. Richardson*, 295 N.C. 309, 245 S.E.2d 754 (1978). Taken as true, the defendant's testimony fails to reveal any statements or conduct by the officers that would engender hope or fear on the part of the defendant. Although the officers told the defendant that they were his only friends and that they would help him with any problems he had, they

did not intimate that by confessing he could avoid prosecution or that any sentence imposed would be lessened. We hold that the defendant's third statement, based on the totality of the circumstances, was not coerced and was voluntarily given. Having determined that this statement was voluntary, we need not address the defendant's contention that this statement tainted his fourth statement.

[9]  We now consider whether the defendant's fourth statement was itself involuntary. The trial court found, with regard to this statement, that the defendant was advised of his rights pursuant to the *Miranda* decision, that he understood each right and waived the same and that he was alert, sober and coherent. The defendant contends that this statement was involuntary based on the totality of the circumstances. The circumstances which the defendant contends show that the statement was involuntary are that: he was in custody; he had been jailed overnight; he had spent the night reviewing his third statement; he had had suicidal thoughts; his only contact with other persons for the previous nineteen hours had been with police officers; and he had just encountered members of the media awaiting his first appearance hearing.

We are not convinced that the factors cited by the defendant are sufficient to establish that he did not voluntarily make his fourth statement. The trial court's findings are supported by competent evidence and as such are binding on appeal. *State v. Harris*, 290 N.C. 681, 228 S.E.2d 437 (1976). This assignment of error is overruled.

[5]  We must next determine whether the erroneous admission of the defendant's first statement was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1988). The first statement was exculpatory. The second statement which was virtually the same as the first statement was properly admitted. Two inculpatory statements of the defendant were properly admitted. In light of the proper admission of three statements by the defendant, we hold that the erroneous admission of one exculpatory statement was harmless beyond a reasonable doubt. *State v. Siler*, 292 N.C. 543, 234 S.E.2d 733.

[10]  The defendant also contends that the defendant's statements should be suppressed because they were the result of an unlawful seizure of his person. *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, *reh'g denied*, 448 U.S. 908, 65 L. Ed. 2d 1138

(1980); *State v. Freeman*, 307 N.C. 357, 298 S.E.2d 331 (1983). In light of our holding that the defendant was not in custody when the second and third statements were made, those two statements were not the result of an unlawful seizure. After the third statement, the defendant was lawfully arrested. The officers had probable cause to believe he had committed a felony. The officers had the authority to arrest him. N.C.G.S. § 15A-401(b)(2) (1988); *State v. Alexander*, 279 N.C. 527, 184 S.E.2d 274 (1971). Any statement the defendant made at that time was not the result of an unlawful seizure. This assignment of error is overruled.

We find no prejudicial error in the trial of the defendant.

NO ERROR.